Salinger, Kenneth W., J.
A week ago the Court decided a motion by NetScout Systems, Inc., for a preliminary injunction that would enforce non-competition and other covenants (the “Agreement”) that Carl Hohenstein entered into when he was employed by Danaher Corporation’s subsidiaries. In support of its motion, NetScout argued and presented evidence that Danaher had assigned to NetScout all of Danaher’s rights under Hohenstein’s non-competition agreement. The Court concluded, based on NetScout’s own evidence, that Hohenstein’s obligations under the disputed provisions of his non-competition agreement expired on July 14, 2016, one year after Hohenstein’s employment with any Danaher subsidiary ended. The Court therefore denied NetScout’s motion to the extent that it sought to enforce the non-competition and non-solicitation covenants, but allowed the other relief sought without any opposition by Hohenstein.[1]
1. Reconsideration
NetScout seeks reconsideration with respect to enforcement of the non-competition and non-solicitation covenants based on a new legal theory as to why it is entitled to enforce the Agreement.
When it first sought a preliminary injunction, Net-Scout filed an affidavit by its Director of Human Resources to explain why NetScout was entitled to enforce Danaher’s rights under the Agreement. She stated that Hohenstein had been employed by a Dan-aher subsidiary called Fluke Networks and that “[o]n July 14, 2015, NetScout acquired Danaher’s communications business, which included Fluke Networks.” The HR Director did not say that Fluke Networks, Inc., had been merged into NetScout or a subsidiary of NetScout. If that had happened, then of course Hohenstein would still be employed by the same company as before the NetScout/Danaher transaction, and NetScout would be entitled to enforce the Agreement as the legal successor to Fluke Networks. But that is not what NetScout contended. Instead, its HR Director swore that as part of the NetScout/Danaher transaction Hohenstein became a NetScout employee and “Danaher’s rights under the Agreement were assigned to NetScout.”
This characterization of the transaction between Danaher and NetScout suggested that NetScout was acquiring selected assets and liabilities of Danaher. As NetScout now recognizes, if whatever Danaher subsidiary that employed Hohenstein had been merged into NetScout or one of its subsidiaries, there would have been no need for Danaher to assign to NetScout its rights against Hohenstein under the Agreement. But NetScout represented that Hohenstein had been employed by Fluke Networks, and the Form 8-K that NetScout filed with the Securities and Exchange Commission at the time it closed its transaction with Danaher makes clear that Fluke Networks was not merged into NetScout. Instead, the Form 8-K states that the transaction was structured as follows: (i) Danaher agreed to and did “transfer . . . certain assets and liabilities of Danaher’s communications business, including . . . certain parts of Fluke Networks Enterprise,” to a new Danaher subsidiary that the parties referred to as “Newco”; (ii) a NetScout subsidiary referred to as Merger Sub merged with and into Newco, with Newco as the surviving entity; and (iii) immediately thereafter, Newco then merged with and into a second NetScout subsidiary referred to as Merger Sub II. This meant that NetScout’s subsidiary Merger Sub II was the legal successor in interest to whatever legal rights belonged to Newco at the time of these statutory mergers.
Significantly, however, when NetScout originally sought a preliminary injunction it did not present any evidence or make any argument that Hohenstein had ever been employed by Newco. To the contrary, Nets-cout showed and argued that Hohenstein had gone directly from being a Fluke Networks employee one day to being a NetScout employee the next. Given this evidence, the Court concluded that Hohenstein’s em *154 ployment relationship with any Danaher subsidiary ended when he started working for NetScout, and thus that the twelve-month post-employment noncompetition period started to run as of July 2015.
In its motion for reconsideration, NetScout asks the Court to consider new evidence and arguments that are inconsistent with its prior submissions. For the first time NetScout asserts that it is entitled to enforce Hohenstein’s Agreement not because Danaher assigned its rights under that contract to NetScout, but instead because it succeeded to Danaher’s rights under that Agreement as a result of a statutory merger.
The mere fact that the NetScout/Danaher transaction included two statutory mergers is, of course, not sufficient to show that NetScout is the legal successor to Danaher with respect to its rights and obligations under its Agreement with Hohenstein. If the Danaher subsidiary that employed Hohenstein was never merged into NetScout, the fact that NetScout merged with some other Danaher subsidiary (Newco) would not give NetScout any right to enforce the Agreement.
But NetScout has now shown that Hohenstein’s employment relationship with Fluke Networks was transferred to Newco before that entity was merged into a NetScout subsidiary. In support of its motion for reconsideration, NetScout provided a copy of the “Employee Matters Agreement” by and among Dan-aher, Newco, and NetScout. That contract provides that all employees of any Danaher subsidiary who were primarily dedicated to Danaher’s communications business would become an employee of Newco as of the date that Danaher transferred its communications business assets and liabilities to Newco, and that to the extent allowed by local employment law the rights and obligations of the Danaher subsidiary that had the employment relationship with the employee would all be transferred to Newco as well. It is undisputed that Hohenstein was employed by Fluke Networks to work on part of Danaher’s communications business.
In sum, NetScout has shown that its prior assertion and evidence that it received an assignment of Danaher’s rights under Hohenstein’s Agreement were incorrect, and that instead Hohenstein’s employment was transferred to a Danaher subsidiary (Newco) that was then merged into a wholly-owned subsidiary of NetScout. Therefore, one effect of the statutory merger of Newco into Merger Sub II is that NetScout, through its subsidiary, became the legal successor to the last Danaher subsidiary that was entitled to enforce the Agreement against Hohenstein.
The Court concludes, in the exercise of its discretion, that it is appropriate to reconsider its prior ruling in light of this new evidence. NetScout does not explain why its legal theory this week differs from and is inconsistent with the legal theory it presented last week. But it appears that this week’s theory is correct, because it comports with the governing contracts that NetScout filed for the first time in support of its motion for reconsideration. Since final judgment has not entered, the Court has “broad discretion” to reconsider all prior rulings in this case. Genesis Technical & Fin., Inc. v. Cast Navigation, LLC, 74 Mass.App.Ct. 203, 206 (2009); accord Herbert A. Sullivan, Inc. v. Utica Mut Ins. Co., 439 Mass. 387, 401 (2003) (“it is within the inherent authority of a trial judge to ‘reconsider decisions made on the road to final judgment’ ” (quoting Franchi v. Stella, 42 Mass.App.Ct. 251, 258 (1997))). And since the Court is now convinced that it should have allowed NetScout’s motion for a preliminary injunction, it is appropriate to correct its prior order. See Jones v. Boykan, 464 Mass. 285, 292 (2013) (“if ajudge determines that ‘he has erred in an announced decision, he ought to correct his error while he still has the power [to do so]’ ” (quoting Sheriff v. Gilow, 320 Mass. 46, 49 (1946))).
2. NetScout’s Rights to Enforce the Agreement
For the reasons discussed above and in the Court’s original memorandum, Hohenstein’s contract with Danaher is an enforceable contract and NetScout is entitled to enforce Hohenstein’s obligations under that Agreement as the legal successor in interest to the Danaher subsidiary that last employed Hohenstein.
3. Scope of Injunctive Relief
The Agreement’s non-competition and non-solicitation provisions may only be enforced to the extent they are reasonable in scope in terms of the activities they restrict, the geographic limitations they impose on those activities, and the length of time they are in effect. See New England Canteen Services, Inc. v. Ashley, 372 Mass. 671, 673-76 (1977); All Stainless, Inc. v. Colby, 364 Mass. 773, 778-80 (1974).
The Court concludes that the Agreement is reasonable with respect to the scope of activities it restricts and the length of time (one year) that those provisions remain in effect after Hohenstein stopped working for NetScout.
But the Agreement’s restrictions on completion and solicitation are overbroad geographically. Hohenstein worked for NetScout as a principal sales engineer for the mid-Atlantic region, which consisted of the District of Columbia and the states of Pennsylvania, Maryland, Virginia, West Virginia, Ohio, Michigan, Indiana, and Kentucky. Although Hohenstein occasionally dealt with customers located outside the mid-Atlantic region, NetScout has not met its burden of proving “that its good will” is likely to suffer irreparable harm if Hohenstein supervises sales engineers who engage in or support sales activity “outside of the sales territory formerly assigned to him.” All Stainless, 364 Mass. at 780.
NetScout argues that Hohenstein had access to technical information about its products, and that this is an independent reason for not limiting the geographical scope of the Agreement’s non-competition *155 and non-solicitation provisions. But NetScout has not met its burden of proving that this information was in fact confidential, as opposed to something that is routinely shared with customers. To the contraiy, NetScout submitted a marketing paper published by Riverbed Technologies that compares the architecture and performance of Riverbed’s products with those sold by NetScout. This suggests that competitors and customers are well aware of the kind of technical information that Hohenstein had access to and used while he was part of NetScout’s sales team. NetScout is not entitled to enforce such an agreement to keep former sales engineers from making use of publicly available information or knowledge that they happened to learn while they were employed by NetScout. See, e.g., Abramson v. Blackman, 340 Mass. 714, 715-16 (1960); Folsum Funeral Service, Inc. v. Rodgers, 6 Mass.App.Ct. 843 (1978) (rescript).
The Court therefore concludes that the non-competition and non-solicitation provisions of the Agreement may only be enforced within the mid-Atlantic region that was the focus of Hohenstein’s sales efforts while employed by NetScout. Cf. All Stainless, 364 Mass. at 780. It will not require NetScout to post any bond because Hohenstein stipulated, in ¶9 of the Agreement, that NetScout could obtain and enforce preliminary or final injunctive relief “without the posting of a bond.”
ORDER
Plaintiffs motion for reconsideration is ALLOWED. The Court will enter an amended preliminary injunction that contains all of the provisions of the original preliminary injunction and that, in addition, bars Defendant from soliciting Plaintiffs customers in the mid-Atlantic states or attempting to sell products that compete with those of the Plaintiff to customers or potential customers in the mid-Atlantic states until January 12, 2018. Plaintiff shall submit a proposed form of an amended preliminary injunction consistent with this order within ten business days.

 Att oral argument, Hohenstein said he did not contest the issuance of an injunction that would bar him from using or disclosing any NetScout proprietary information, helping to develop products or services that would compete with NetScout’s offerings, helping to hire away NetScout’s employees or contractors, or interfering in any relationship with NetScout’s vendors.